United States District Court
District of New Jersey

| | |
|---|---|
| UNITED STATES OF AMERICA | : HON. ESTHER SALAS |
| v. | : Magistrate No. 09-7114 |
| MOSHE BUTLER, <br> a/k/a "Marcus Butler," <br> a/k/a "John Savoy" | : **CRIMINAL COMPLAINT** |

I, Sean Langford, being duly sworn, state the following is true and correct to the best of my knowledge and belief. From at least as early as in or about July 2008 to in or about June 2009, in Bergen County, in the District of New Jersey and elsewhere, defendant MOSHE BUTLER, a/k/a "Marcus Butler," a/k/a "John Savoy" did:

knowingly devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce writings, signs and signals for the purpose of executing such scheme and artifice.

In violation of Title 18, United States Code, Sections 1343 and 2.

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

SEE ATTACHMENT A

_____
Sean Langford
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
on September 29, 2009 at Newark, New Jersey

_____
HONORABLE ESTHER SALAS
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

I, Sean Langford, am a Special Agent with the Federal Bureau of Investigation. I have knowledge about the facts set forth below from my involvement in the investigation, review of reports and documents, and discussions with other law enforcement officials. This complaint is submitted for a limited purpose, and I have not set forth each and every fact that I know concerning this investigation. All statements described herein are relayed in substance and in part.

1. At all times relevant to this complaint, defendant MOSHE BUTLER, a/k/a "Marcus Butler," a/k/a "John Savoy," (hereinafter "BUTLER") defrauded multiple hotel and motel development companies out of millions of dollars by obtaining payment for but failing to deliver large numbers of flat panel televisions by making materially false and fraudulent pretenses, representations and promises, and causing interstate wire transfers in furtherance of the fraud.

2. From before 2008 until in or about February 2009, defendant BUTLER worked as a salesman at a New Jersey company ("Company 1") that sold mirrors and artwork to hotel and motel chains. In this position, defendant BUTLER was familiar with the purchasing agents of numerous hotel and motel chains and the procedures that they followed when buying large quantities of products for hotels at once. In or about February 2009, defendant BUTLER's employment with Company 1 was discontinued and he told his supervisors that he was going to start his own purchasing company.

3. Prior to leaving Company 1, however, defendant BUTLER began to market by email and telephone flat panel televisions to some of the same customers he worked with at Company 1. When marketing these televisions, defendant BUTLER claimed to be working on behalf of one of two companies he controlled, SB Purchasing Group, LLC ("SB Purchasing") and NI Group, both of which he claimed maintained business offices at 375 South Washington Avenue, Bergenfield, New Jersey.

4. As part of his scheme, defendant BUTLER falsely told potential customers that his company had sold televisions to hotels for a number of years and had delivered thousands of units. Defendant BUTLER also claimed that he could supply brand name flat panel televisions at extremely low prices which would come with a lengthy warranty.

5. To certain potential customers, defendant BUTLER identified himself by his real name. To other customers, defendant BUTLER identified himself as "John Savoy." On occasion and while he was still working at Company 1, defendant BUTLER recommended that hotel chains purchase their televisions from "John Savoy," whom he falsely indicated was someone other than himself.

6. Numerous hotel chains placed orders with defendant BUTLER based on the representations that he made in emails and during telephone calls. These orders were regularly for hundreds of televisions with a total cost of hundreds of thousands of dollars. Pursuant to the invoices that defendant BUTLER issued, payment was usually due in full

prior to the delivery of the televisions. These payments were regularly made by interstate wire transfers.

7. As further part of his scheme, on certain occasions, defendant BUTLER actually delivered all of the televisions that a customer had purchased. More often than not, however, customers would receive only a portion or none of the televisions they had purchased. After not receiving televisions that they had purchased, many of the customers contacted defendant BUTLER and demanded repayment. While defendant BUTLER would often agree to refund a customer's money, he regularly sent out large "refund" checks that were returned by banks for insufficient funds.

8. As a result of this scheme, defendant BUTLER received more than $1 million from companies that paid for televisions which Butler never delivered.

9. Victim 1, a hotel development company headquartered in Birmingham, Alabama, was one victim of Butler's scheme. Victim 1 owns and operates hotels under various nationally known hotel names. Company 1 was a preferred vendor of Victim 1 and as such, had done business with them in the past.

10. On or about July 21, 2008, Victim 1's Director of Development, T.W., received an email from "John Savoy" of SB. In that email, "Savoy" identified himself as the owner of "SB Purchasing Group" which he claimed had "been providing flat screen TV's to the hospitality industry for the past 4 years." He also claimed to have "delivered over 17,000 units over the past 15 months." "Savoy" wrote that "[o]ne of the advantages of working with us is that we provide a full 4 year warranty on all of our units – while most companies provide at most a 1 or 2 year warranty." Over the next three months, "Savoy" sent T.W. at least three additional emails, all soliciting T.W.'s business. During that same time period, T.W. had email exchanges with defendant BUTLER when he was acting on behalf of Company 1.

11. On or about November 10, 2008, in his capacity as an employee of Company 1, defendant BUTLER called T.W. During that telephone call, defendant BUTLER recommended that T.W. use "John Savoy" as a supplier of flat panel televisions for a hotel that Victim 1 was developing in Alabama. Defendant BUTLER highly recommended "Savoy" and claimed that he had done business with "Savoy" in the past. T.W. did not know "Savoy" but recognized his name because he had received telephone calls and a number of emails from "Savoy" over the preceding months.

12. After receiving defendant BUTLER'S recommendation of "Savoy" on or about November 10, 2008, T.W. agreed to purchase 157 flat panel televisions from "Savoy." On or about November 16, 2008, "Savoy" issued an invoice to Victim 1 in the amount of $123,013.71 for the 157 televisions and related parts. The invoice was issued not by SB Purchasing, but by the NI Group. Under the terms of the invoice, Victim 1 was to pay the total amount due prior to delivery of the televisions, which was scheduled for late January 2009. On or about November 24, 2008, Victim 1 mailed a check for the total amount

the invoice made payable to NI Group. NI Group deposited the check on or about November 28, 2008.

13. On or about November 24, 2008, T.W. placed two additional large orders with "Savoy" – 143 televisions for a hotel in South Carolina and 116 televisions for a hotel in North Carolina. The total cost of these two purchases was $191,496.83. Pursuant to similar invoices issued by NI Group, Victim 1 was required to pay this entire amount prior to the scheduled December 20, 2008 delivery. On or about November 25, 2008, Victim 1 sent two interstate wire transfers to NI Group to satisfy the total amount due. Specifically, on or about November 25, 2008, Victim 1 sent a $105,729.91 wire transfer from a bank account in South Carolina to NI Group's bank account at a bank in Teaneck, New Jersey and a second wire transfer of $85,766.92 from a bank account in North Carolina to the same account in Teaneck, New Jersey.

14. Despite paying "Savoy" approximately $314,510, Victim 1 never received a single television it ordered. Victim 1 made numerous efforts to recover this money, all to no avail. For example, on or about January 27, 2009, T.W. called "Savoy" and during the call, "Savoy" stated he would refund Victim 1's money by sending a check via Federal Express. On or about January 28, 2009, Victim 1 received a $150,000 check from "Savoy," however, the check was returned by the bank for insufficient funds. On or about February 5, 2009, Victim 1 received another $150,000 check from "Savoy," and again, the check bounced.

15. At some point after receiving the bounced checks described above, T.W. contacted defendant BUTLER at Company 1 to discuss the problem since defendant BUTLER was the person who had recommended "Savoy." Defendant BUTLER did not answer the phone. Upon hearing the recorded voicemail message created by defendant BUTLER, T.W. realized that defendant BUTLER and "Savoy" were the same person and had the same outgoing message.

16. After coming to this realization, T.W. and a second employee of Victim 1 called and spoke to defendant BUTLER. They told defendant BUTLER that they knew he was the same person as Savoy. Defendant BUTLER told the Victim 1 employees that he would refund Victim 1's money if they would help him avoid being arrested.

17. The last communication between Victim 1 and defendant BUTLER was in on or about mid April 2009. At that time, defendant BUTLER stated he would come to Victim 1's office with the full amount he owed them on or about April 21, 2009. Defendant Butler never showed up and continues to owe Victim 1 approximately $314,510.